**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

PAUL ROSS JENNINGS,     )
              )
     Plaintiff,    )
              )
vs.            )   Case No. 10-cv-811-TLW
              )
MICHAEL J. ASTRUE,     )
Commissioner of the Social Security )
Administration,       )
              )
     Defendant.   )

## OPINION AND ORDER

Plaintiff Paul Ross Jennings, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying his application for disability benefits under Title II of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 8). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.

## Review

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security

regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; <u>Williams v. Bowen</u>, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." <u>Williams</u>, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. <u>Grogan v. Barnhart</u>, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Id.</u> The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." <u>Id.</u> The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. <u>See</u> <u>Hackett v. Barnhart</u>, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. <u>White v. Barnhart</u>, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The

evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a).

## Background

Plaintiff was born March 22, 1959 and was 50 years old at the time of the final decision of Administrative Law Judge ("ALJ") Charles Headrick on March 12, 2010. (R. 920). Plaintiff is 5'11" tall and weighs 300 pounds. Id. Plaintiff graduated high school and has additional vocational training in broadcasting, travel, and truck driving. (R. 921). Plaintiff's prior work history consists of an auto parts puller, service order dispatcher, delivery driver, airport security attendant, and "a provider for the disabled." (R. 945). Plaintiff alleged a disability onset date of July 14, 2008. (R. 129).

Plaintiff had a hearing before the ALJ on February 10, 2010. The ALJ issued a decision on March 12, 2010, denying plaintiff's claim for benefits. Plaintiff appealed that decision to the Appeals Council, which declined to review the decision of the ALJ. (R. 1-4).

## ALJ Hearing Summary

In his opening statement, plaintiff's attorney discussed a functional capacity evaluation performed in conjunction with plaintiff's Workers' Compensation claim. He stated since the state agency RFC was completed at approximately the same time, the reviewer completing the Social Security RFC form did not have the benefit of that evaluation, which indicated plaintiff could lift at a sedentary level, but could only sit three hours in an average work day. The attorney claimed that when considering that evaluation with the psychological limitations found in exhibit 34F (a Mental RFC assessment completed by agency physician Sally Varghese, M.D.), the plaintiff should be found disabled at step five. Plaintiff's counsel also proffered the theory that

based on testimony from the vocational expert ("VE"), plaintiff would "grid out at 201.14." (R. 919).

Plaintiff testified he last worked as a security guard at the airport in July of 2008, and ended that employment due to increased pain in his back. (R. 922). Plaintiff stated that he has not attempted to return to work because of back pain and an inability to lift. Id. He said when he left the security guard job, he had surgery to remove hardware placed during an earlier back surgery after an on the job injury at a funeral home.[1] (R. 924). The doctors plaintiff saw in conjunction with his workers' compensation injury were Dr. Anagnost, Dr. Hicks, and Dr. Trinidad. (R. 925). He stated that based on reports from these doctors, he was examined to determine his remaining functional capacity and was told he could not lift more than ten (10) pounds, and not to "do any stooping, bending, or anything unnecessarily." (R. 926). His workers' compensation claim was settled for $23,000.00. Id. Plaintiff said he has been visiting a therapist, psychologist, and a psychiatrist at Bill Willis Community Mental Health Center since 2006. (R. 926-927). Plaintiff said he is on medication for depression, but said the medication has been changed three times because each became ineffective. (R. 927).

Plaintiff stated he takes anxiety medication which allows him to sleep four to five hours without thinking about his depression and pain. He also sleeps four to five hours a night. (R. 928, 933). He lives in a travel trailer on a rented lot, does not care for the lot, prepares small meals for himself, and does very little housekeeping. (R. 929, 935). He attends a small church twice a

---

[1] Plaintiff testifies he has had "seven or eight" back surgeries. (R. 938). The ALJ clarified this point by walking plaintiff through the actual back surgeries he has had, which were three including removal of hardware. The remaining surgeries were to clean out and treat an infection. (R. 942-943).

week, and is able to deal with the people at the church because he has little contact with them. (R. 929). He does not visit with friends or family, in person or on the phone. (R. 930).

Plaintiff testified that he is able to lift no more than ten (10) pounds, that he believes he can sit a total of three (3) hours in a workday (in 30 minute periods), and stand a total of one to two hours in eight (ten to fifteen minutes at a time). After sitting 30 minutes or standing about 15 minutes, plaintiff said he experiences pain in his back that radiates down his left leg. (R. 930-932). He testified he can walk approximately 100 feet before experiencing back pain,[2] and cannot bend from the waist to do anything, stating he is prescribed Lortab for pain. (R. 932). He also claimed he uses "the psychotropic mediation" (no medication name was given) for anxiety and pain relief. (R. 933). Describing the effects of his depression and anxiety, plaintiff said he becomes angry, confused, and is unable to understand what people are saying. (R. 934). He claims to have no history with drug or alcohol abuse and that he is compliant with his psychiatric treatment plan. Id.

Plaintiff owns a vehicle and stated he is able to drive for approximately 45 minutes to an hour at a time before having to stop and get out of the vehicle due to back problems. (R. 936). He claimed to watch TV and movies in order to pass time when he is not sleeping. (R. 937). He also claimed he is not currently receiving any medical treatment, because he does not have the money to pay for it. He is treated at Bill Willis Community Mental Health Center for free, but he claimed doctors there have told him there is nothing more they can do for his physical problems. (R. 938). He stated he has no problems with his hands or reaching overhead. Id.

---

[2] Plaintiff later makes a statement he can walk 200-300 feet before pain impairs his progress and he begins to limp. (R. 938).

## Medical History

Plaintiff presented to the St. Francis Emergency Room on January 1, 2007 with complaints of lower back pain that radiated down his left leg. He denied a recent injury.[3] (R. 238-255). He was released with instructions for home treatment of a strained muscle, which included a narcotic pain reliever, a muscle relaxer, rest, ice, and compression packs. (R. 244).

Plaintiff presented to David R. Hicks, M.D. of Central States Orthopedic on January 12, 2007 after his work related injury, complaining of back pain with radiation into his legs. Dr. Hicks had performed a prior fusion surgery on plaintiff's lumbar spine at L4-5 and L5-S1. He noted plaintiff's past history of hypertension, renal dysfunction, diabetes mellitus, and arthritis. Upon examination, plaintiff displayed tenderness over the "posterior elements of his lumbar spine and left posterior iliac spine without significant sciatic notch, groin or coccygeal pain." (R. 493). Plaintiff's range of motion in both hips was normal, and straight leg testing was negative bilaterally. Dr. Hicks' impressions were: (1) Healed lumbar fusion L4-5 and L5-S1; (2) Lumbar strain versus L3-4 disk herniation; and (3) No serious neurological deficits. He prescribed Lortab (a narcotic pain reliever); Flexeril (a muscle relaxer); and Naprosyn (an anti-inflammatory pain reliever used for arthritis), and referred plaintiff for physical therapy and an MRI of the lumbar spine.

Plaintiff received physical therapy at Orthopedic Hospital of Oklahoma from January 18, 2007 through January 31, 2007. (R. 421-434). Several notes in his records indicate he was "tolerating activities well." (R. 427, 428, 430, 431, 432). He returned to Dr. Hicks February 2, 2007. Plaintiff visited Dr. Hicks for the results of his MRI and treatment options. Dr. Hicks noted

---

[3] The record reflects that plaintiff presented to St. Francis Health System after a work related injury to his back on December 29, 2006. (R. 250).

the MRI revealed evidence of spinal stenosis at the L2-3 and L3-4 levels of his lumbar spine. No "clear pattern of motor, reflex or sensory loss" was found in either lower extremity. (R. 495). Dr. Hicks' plan of treatment included an epidural steroid injection to plaintiff's lumbar area, and work restrictions of no lifting over ten (10) pounds. Id.

On February 9, 2007, plaintiff received the recommended epidural steroid injection to treat stenosis that had developed over the site of his lumbar fusion. (R. 419). On March 1, 2007, Dr. Hicks examined plaintiff after the epidural steroid injection did not help plaintiff's pain. He did not note any "clear pattern of motor, reflex or sensory loss" in either leg. Dr. Hicks noted an intention to send plaintiff to a "spine rehab program," gave him no new prescriptions, and stated he could continue to work with the same restrictions (no lifting or carrying over ten (10) pounds). (R. 507).

Dr. Hicks referred plaintiff to physical therapy at Orthopedic Hospital of Oklahoma from March 5 through March 30, 2007. (R. 395-415). Plaintiff consistently complained of lower back pain radiating down his left leg. The therapist also consistently noted plaintiff "appeared to be in less discomfort post treatment." (R. 401-410).

Plaintiff received an epidural steroid injection at L2-3 and L4-5 on April 27, 2007 for acquired spinal stenosis at those levels with degenerative disc disease. (R. 393). On May 10, 2007 Dr. Hicks noted plaintiff experienced little relief from two (2) epidural steroid injections, and likely had reached maximum medical improvement. He requested a functional capacity evaluation to determine any permanent restrictions. (R. 509).

Plaintiff had a Functional Capacity Evaluation ("FCE") at Orthopedic Hospital of Oklahoma on June 8, 2007. (R. 196-213). The examiner found plaintiff demonstrated a light

"physical demand level," showing a maximum lifting capacity of 20 pounds occasionally. A frequent lifting limitation was not determined because plaintiff complained he was unable to squat to lift the crate off the floor. He was unable to complete a kneeling test and a frequent lift test from waist to shoulder due to pain. The examiner noted plaintiff's efforts on the FCE suggested an invalid test, stating he tested positive on four of seven Waddells Signs for "possible non-organic back pain." Symptom magnification was also suggested due to reported pain levels of 6 of 10. (R. 196, 361-388).

Plaintiff returned to Dr. Hicks on June 14, 2007 for the results of his FCE and learned he could "safely work" with the restriction of no lifting or carrying more than 20 pounds. Plaintiff informed Dr. Hicks he was so uncomfortable on a daily basis, he wished to proceed with decompression and fusion surgery. Dr. Hicks noted he was able to work safely with restriction until surgery. (R. 510). On July 10, 2007, Dr. Hicks performed "decompressive lumbar laminectomies with wide bilateral decompressive foraminotomies at L2-3, L3-4." (R. 258-262, 324-356, 487-488). During the operation, a nerve conduction was performed. Changes were noted and Dr. Hicks was notified. (R. 347). After developing a staph infection in the incision from the July 10, 2007 lumbar decompression surgery, Dr. Hicks and Mark H. Grosserode, M.D. admitted plaintiff to St. Francis Hospital on July 22, 2007 for additional surgery and treatment of the infection. (R. 215-237, 485-486).

Plaintiff was seen on August 23, 2007 for a follow up visit after surgery. A subcutaneous infection developed post-operatively, which was treated with intravenous antibiotics. Dr. Hicks noted an x-ray revealed "a rapidly consolidating but not yet healed fusion at L2-3 and L3-4 with retained Legacy instrumentation." (R. 478). His opinion was that plaintiff remained "temporarily

totally disabled," and he hoped plaintiff would be able to begin a spinal rehabilitation program within three (3) weeks. Id.

By plaintiff's September 13, 2007 follow up visit, his infection had resolved itself and his antibiotic was discontinued. Dr. Hicks again noted an x-ray showed a "consolidating fusion at 2-3 and 3-4 laterally with retained Legacy instrumentation at those levels," and that plaintiff had a "healed fusion without instrumentation at L4-5 and L5-S1." (R. 477). Dr. Hicks stated he wanted to start plaintiff on an aquatic therapy program. Id. Plaintiff presented for another follow up appointment on October 1, 2007. He attended aquatic therapy sessions for the previous three (3) weeks, and showed a fifty percent improvement. The fusion was not yet "rock solid," but it continued to consolidate. Dr. Hicks decided plaintiff should advance to a land based therapy program before having a functional capacity assessment performed. (R. 476). Two days later, plaintiff presented to Dr. Hicks with another staph infection. Debridement surgery was performed October 4, 2007. (R. 257, 296-323, 475, 484). On October 15, 2007, Dr. Hicks removed plaintiff's stitches and noted he was in little pain. (R. 474). Plaintiff presented with a headache and possible fever on October 26, 2007. He was concerned his infection had returned, but Dr. Hicks performed an examination of the wound site and found it benign. An x-ray revealed a healed fusion at L2-3 and L3-4. (R. 473).

On November 2, 2007, Dr. Hicks noted plaintiff's infection appeared to be resolved. Hardware removal was discussed with plaintiff by Dr. Grosserode, which upset plaintiff as he did not wish to undergo any further surgeries. Dr. Hicks' planned to restart aquatic therapy for plaintiff, and again move to land based therapy. (R. 472). On November 19, 2007, Dr. Hicks noted plaintiff continued to improve, and that he had "minimal back pain at this point in time."

His x-rays showed a "rock solid fusion" at L2-3 and L3-4 with instrumentation. Dr. Hicks opined plaintiff was "not likely going to be able to return to the job in which he was previously employed" due to heavy lifting involved with that job. He noted plaintiff's likely permanent lifting restriction would be around 25 pounds. Dr. Hicks recommended plaintiff be placed into a job placement or vocational retraining program immediately. (R. 471).

During plaintiff's December 17, 2007 follow up appointment, Dr. Hicks noted plaintiff continued to improve. Plaintiff showed no "clear pattern of motor, reflex or sensory deficit in either lower extremity." Dr. Hicks discussed removing plaintiff from all antibiotics, with Dr. Hicks to monitor his blood work for signs of returning infection with Dr. Grosserode. He placed a 20 pound lifting restriction on plaintiff, decided he should discontinue therapy, and barring any problems with infection, planned to release him from care at his next visit. (R. 470). Plaintiff contacted Dr. Hicks on December 28, 2007 because he had obtained a job which entailed a lot of standing. This increased his back pain. Dr. Hicks planned to make appropriate contacts to enroll plaintiff in a job placement assistance or re-training/re-education program. (R. 469).

Plaintiff's infection returned. Dr. Hicks performed another surgery on January 16, 2008 to again irrigate and debride an infection in his original decompression incision. (R. 256, 264-295, 483). Two additional visits in January showed plaintiff's infection was continuing to heal. On February 8, 2008, Dr. Hicks noted plaintiff's incision was healing. Plaintiff was to continue use of antibiotics. (R. 496).

Plaintiff received two workers' compensation examinations by Kenneth R. Trinidad, D.O. in 2008, once February 29, 2008, and again April 24, 2008.[4] (R. 435-445, 446-456). After the February 29th examination, Dr. Trinidad's impressions were plaintiff suffered a work-related

---

[4] There are two exhibits with identical reports from Dr. Trinidad, 6F and 7F.

lumbar spine injury and consequent wound infection in the surgery site, and depression resulting from chronic pain from the injury and resulting inability to work. (R. 443-444). He stated plaintiff needed further evaluation and treatment, and recommended plaintiff continue under the care of treating orthopedic surgeon, Dr. Hicks, infectious disease specialist, Dr. Grosserode, and continue psychiatric care at Bill Willis to treat his depression. Dr. Trinidad opined plaintiff was unable to perform any work activities, and "remain[ed] temporarily totally disabled." (R. 444).

On April 24, 2008, Dr. Trinidad again examined plaintiff, this time for "permanent impairment." (R. 439). After detailing his findings, Dr. Trinidad explained he found plaintiff to have an overall "whole man" impairment of 69 percent, with 30 percent attributed to an injury in 1993, and 39 percent due to the 2006 injury. The percentages were broken out as follows:

| Range of motion restriction | 21 percent |
| L4-5 and L5-S1 fusion | 13 percent |
| L2-3 and L3-4 fusion | 13 percent |
| Four additional surgeries | 5 percent |
| Lumbar epidural steroid injection | 8 percent |
| Left leg radiculopathy | 9 percent |
| Total | 69 percent |

(R. 440). In addition to the 69 percent physical impairment rating, Dr. Trinidad taxed plaintiff with a total 20 percent psychological impairment, with 10 percent rated to his 1993 injury, and 10 percent rated to the 2006 injury. Id. Dr. Trinidad opined plaintiff had reached maximum medical recovery and no further therapy would improve his "stable and chronic" condition. (R. 441). He stated his belief was that plaintiff's ability to earn income at his previous level was diminished. Id.

On March 26, 2008, Dr. Hicks released plaintiff to work with the temporary restrictions of no lifting or carrying over 20 pounds, and no frequent bending or stooping. (R. 462). Dr. Hicks felt plaintiff had reached maximum medical improvement. Id. Plaintiff returned to Dr. Hicks on June 12, 2008, stating he was employed by the airport in security. He complained of low back pain and pain into his buttocks that had developed over the previous few days. Dr. Hicks ordered an x-ray which showed healed fusions at L2-3 and L3-4 with hardware, and at L4-5 and L5-S1 without hardware with no evidence of acute infection. Dr. Hicks prescribed the narcotic pain reliever Lortab. He stated if plaintiff's pain did not improve, he would order an MRI of the lumbar spine by the next week. (R. 461). Plaintiff received a lumbar MRI at the request of Dr. Hicks on July 28, 2008. It revealed:

1. Status post midline laminotomy at L4-5 and L5-S1 with a solid posterolateral fusion and fusion across the intervertebral disc spaces, unchanged.
2. Interval midline laminectomy at L2-3 and L3-4 with posterolateral fusion with posterior hardware including bilateral pedicle screws from L2 through L4 with interconnecting rods. The central canal stenosis at both levels previously demonstrated is no longer seen.
3. Mild developmental central canal stenosis at the L2 level. Mild annular bulge of the L1-2 intervertebral disc with ligamentum flavum thickening. Moderate L1-2 central canal stenosis, progressed.

(R. 482). On August 11, 2008, Dr. Hicks saw plaintiff and reviewed his MRI results. Dr. Hicks' impressions were probable painful hardware, post laminectomy syndrome, and no serious neurological deficit. He did not recommend more surgery due to plaintiff's recurring postoperative staph infection, and plaintiff agreed. He gave plaintiff a prescription for ibuprofen 800 mg tablets, and released plaintiff to return to work with no change in his work restrictions. (R. 480). Ten days later, on August 22, 2008, plaintiff returned to Dr. Hicks asking for hardware removal. Dr. Hicks explained his opinion that removal of the hardware was not the right medical

thing to do considering the previous trouble with infection. He did prescribe a stronger pain medication and referred plaintiff to Dr. Gerald Hale [5] for evaluation for chronic pain management.[6] (R. 458).

On October 8, 2008, Janice B. Smith, Ph.D. completed a Psychiatric Review Technique ("PRT") form regarding plaintiff. (R. 584-597). Dr. Smith evaluated plaintiff's depression under 12.04, Affective Disorders, and found his impairment was not severe. (R. 584). Plaintiff was found to have a mild impairment in the areas of restriction of activities of daily living, difficulties maintaining social functioning, and maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 594). In her notes, Dr. Smith stated plaintiff did not allege a mental impairment, yet records from St. Francis Hospital showed a history of depression and diagnosis of bipolar disorder and prescriptions for anti-depressant medications. She noted plaintiff's activities of daily living and history of steady work. (R. 596).

Medical records from Bill Willis Community Mental Health Center show plaintiff was seen for counseling and/or treatment 65 times between July 9, 2006 and October 12, 2008. (R. 599-669). Initially, plaintiff sought help for suicidal ideations. He stated in July, 2006 that he had a vivid dream in which he shot himself and everyone else in his church. (R. 665). At his August 15, 2006 appointment, plaintiff reported "no immediate threat to self or others." (R. 664). In September, 2006, Debra Williams, BS/BHRS, plaintiff's case worker, noted he had no suicidal or homicidal ideations, and he was to look for financial assistance as part of his treatment plan. (R. 660). In October, 2006, plaintiff reported the dream of killing people at his church and then

---

[5] Gerald Hale, D.O. reported no records were available for plaintiff from September 1, 2008 through October 13, 2008. (R. 583).

[6] Dr. Hicks' staff noted this was his last visit to their office. (R. 741).

himself to Ms. Williams, and stated he had a plan to carry out his thoughts. Ms. Williams recommended plaintiff admit himself into Wagoner County Hospital for help. (R. 659, 667). At his next appointment after treatment at Wagoner County Hospital, plaintiff reported no suicidal or homicidal ideations, and that he felt "a lot better" and "like[d] the medication he [wa]s on." (R. 658). In December, 2006, plaintiff reported he was working 12 hour shifts and that he enjoyed the job. He was compliant with his medication, but reported experiencing depression some days. (R. 653). By January, 2007, plaintiff was again not working because of problems with his back. He also reported his depression was worse and he was having problems with suicidal thoughts again. (R. 650). In February, 2007, plaintiff reported no problems with hallucinations, or suicidal and homicidal ideations, that he planned to move soon, and that he was attending church more often, which helped his depression. (R. 648). In May, 2007, plaintiff was again experiencing suicidal thoughts. He reported that he sold all his things, including the trailer he lived in, without knowing why. Ms. Williams noted plaintiff's mood was depressed. (R. 641).

On May 21, 2007, plaintiff was given Axis diagnoses of Axis I: major depressive disorder without psychosis; obsessive compulsive disorder, and panic anxiety attacks; Axis II: avoidant personality disorder; Axis III: hypertension, diabetes type II, and back injuries; Axis IV: workers' compensation; and Axis V: GAF score of 50 by psychiatrist Jorge Perez-Cruet, M.D. (R. 639-640). On June 5, 2007, plaintiff presented to Ms. Williams for a scheduled appointment. He had no problems with suicidal ideations, had attended scheduled doctor appointments with M. May, M.D., and was compliant with his medications. He reported the medications were helping and his anxiety level around groups of people was much less. He noted

he had not dealt with past sexual abuse from a brother, and that, plus thoughts of his father dying several years before, triggered depressive episodes. (R. 638). Plaintiff missed a few appointments in August, 2007 because he was hospitalized for a staph infection after back surgery. He met with his case worker, Ms. Williams, on August 23, 2007. He reported he would be homeless when his workers' compensation checks ceased. She assisted him with an application for HUD housing. (R. 632).

In November, 2007, plaintiff reported more surgery for the infection at the site of his back surgery, that "when this is all over that they want to retrain him," and noted he did not want to depend on social security disability as income because he thought it would not be enough. (R. 624). In February, 2008, plaintiff noted he wanted his next treatment plan to include learning to have more social interaction. (R. 619). In April, 2008, plaintiff reported his depression had decreased because he found a job at the Tulsa airport. (R. 613). In May, 2008, plaintiff visited Dr. May again. Dr. May noted plaintiff "seem[ed] to be doing well," and adjusted his medications. Plaintiff reported to Dr. May he would visit with friends for dinner, swim with friends, and was considering buying "another boat." (R. 611). Plaintiff also reported his job at the airport made him feel better, that he had made new friends at work, was getting out more, and enjoyed being around people. (R. 609, 610). By July, 2008, plaintiff was experiencing more depression, not sleeping, nightmares, and reported he was unhappy with his job. (R. 607). Dr. May noted plaintiff complained of back pain often, and lost his job at the airport due to recurrence of his pain. Plaintiff stated he had not spent time with friends, but did find old high school friends online. One invited plaintiff to move to Tennessee to live with him. Dr. May adjusted plaintiff's medication. (R. 606). On August 6, 2008, Ms. Williams helped plaintiff apply

for Social Security disability online. (R. 604). Plaintiff's depression continued in October, 2008, reportedly due to the loss of his job and having to depend on a friend for financial support. (R. 602).

Thurma Fiegel, M.D. completed a physical RFC assessment for plaintiff on October 20, 2008. (R. 670-677). The primary diagnosis was degenerative disc disease, with a secondary diagnosis of diabetes mellitus. (R. 670). Dr. Fiegel found plaintiff retained the RFC to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk, and sit (with normal breaks), all for six (6) hours in an eight (8) hour workday. Push and/or pull (including operation of hand and/or foot controls) was rated unlimited other than shown for the lift and/or carry limitations. To support the RFC, Dr. Fiegel noted plaintiff's history of back surgeries with infection, the fact that Dr. Hicks consistently found "no clear pattern of motor, reflex or sensory loss in either lower extremity," noted Dr. Hicks' weight restrictions on lifting when he released plaintiff back to work, and the fact plaintiff continued to work even with pain with prolonged standing. (R. 671). Dr. Fiegel also noted a July 28, 2008 MRI showing "mild canal stenosis L2 and moderate L1-2 central canal stenosis," and that while Dr. Hicks referred plaintiff for pain management, that doctor had not seen plaintiff. (R. 672). Postural limitations (climbing, balancing, stooping, kneeling, crouching, and crawling) were all rated as occasional, plaintiff was given no manipulative, visual, communicative, or environmental limitations. (R. 672-674). Dr. Fiegel noted Dr. Hicks supplied a Medical Source Statement consistent with plaintiff's history and the current findings. (R. 676).

Steven Anagnost, M.D. wrote a letter on September 30, 2008 to plaintiff's workers' compensation case workers detailing his examination and understanding of plaintiff's history,

and his plan to remove plaintiff's hardware. (R. 828-830). Plaintiff presented to Hillcrest Medical Center on October 20, 2008 complaining of painful hardware in his back with a "painful deep seroma" and infection. (R. 679). On examination, Dr. Anagnost noted plaintiff walked with a very painful gait, and had severe tenderness around the hardware. He also noted a bilateral positive straight leg raising test, and hyporeflexive (below normal reflexes) deep tendon reflexes at L4, and "+1 at S1." No clonus (rhythmic reflex tremor) or upgoing toes were noted. Id. His impression was radiculopathy, weakness, and painful hardware at L3-4 and L4-5, and "seroma" (a pocket of bodily fluid). Dr. Anagnost recommended plaintiff have the hardware removed, and the seroma irrigated and debrided. (R. 680).

Dr. Anagnost performed the surgery, and noted afterward plaintiff awoke with improvement of his buttock and leg pain and "marked improvement" of his back pain. (R. 684). On November 4, 2008, Dr. Anagnost saw plaintiff for a follow up after his back surgery. In a letter of the same date to plaintiff's workers' compensation case workers, he informed them of his intent to send plaintiff for physical therapy and noted plaintiff would have a permanent 20 pound lifting restriction. (R. 698, 831).

Plaintiff submitted more treatment records from Bill Willis beginning December 5, 2008 with a visit to Dr. May and Ms. Williams. He discussed problems with his depression with each of them, although he did not speak of suicidal ideation to Ms. Williams, he did inform Dr. May he thought about it more. (R. 752-753).

On December 11, 2008, Dr. Anagnost wrote a letter of maximum medical improvement for plaintiff, stating he was "doing well" overall, with some achiness into his leg, but noted plaintiff was glad he had the operation. He was given a TENS unit to help control pain. (R. 832).

The same date, plaintiff received permanent restrictions of "no lifting/carrying" and "no pushing/pulling" over 20 pounds each from Dr. Anagnost. (R. 825).

On February 4, 2009, Luther Woodcock, M.D., an agency physician, assessed plaintiff with a physical RFC consistent with the restrictions imposed by Dr. Anagnost. (R. 839-846). On February 12, 2009, Richard J. Hamersma, Ph.D., reviewed plaintiff's record and indicated a current mental status evaluation was needed as the medical evidence of record did not support the psychiatric review technique form from October, 2008. (R. 848). Dr. Hamersma completed a review of that form, and disagreed with most areas, with no explanation. (R. 849-851). On February 17, 2009, Jessica Tinianow, M.D., concurred with Dr. Woodcock's physical RFC assessment of plaintiff. (R. 852-853).

Plaintiff received a "functional capacity evaluation" from Stephen Kabrick of Kabrick and Associates, a physical therapy center, on March 2, 2009. (R. 856-857). He rated plaintiff's capacity as sedentary due to his inability to safely lift ten pounds, dropping it because of "sudden onset of low back pain and left leg pain." (R. 857).

On April 13, 2009, plaintiff received a mental status consultative examination from Michael D. Morgan, Psy.D. at the request of Sally Varghese, M.D. (R. 861, 862-867). This examination revealed no diagnosis of bipolar disorder, as plaintiff reported. In the area of daily functioning, plaintiff reported nightmares, disrupted sleep, napping during the day due to fatigue, a good appetite, and Dr. Morgan noted he had reduced motivation. (R. 863). In social functioning, Dr. Morgan noted plaintiff had regular contact with family and friends, regularly attended church, ran errands, visited friends, watched TV, maintained his personal hygiene, kept his home up, cared for his dog, and kept medical appointments. Id. During the examination, Dr.

Morgan noted plaintiff's memory and concentration levels appeared normal, his speech was normal, his mood was moderately depressed. Dr. Morgan stated "[s]ufficient signs and symptoms for major depression were present," but plaintiff did not "meet the criteria for mania or hypomania" (associated with bipolar disorder). He did meet the criteria for posttraumatic stress disorder (PTSD), showed no personality disorder, his thought process was normal, and Dr. Morgan observed he "operated at the average level of intelligence," and judgment and insight were rated as good. (R. 865). With this information, Dr. Morgan rated plaintiff with the following Axis diagnoses: I-posttraumatic stress disorder, chronic, and major depressive disorder, recurrent, moderate; II-no diagnosis; III-chronic back pain; IV-unemployment, inadequate access to "appropriate" mental health care; and V-GAF score of 56-60. (R. 866). His prognosis was that with "addition of appropriate behavioral counseling or psychotherapy to his current treatment regimen," plaintiff's psychological functioning level would improve within one to two years. Id.

Based on the record as a whole, Dr. Varghese compiled another Psychiatric Review Technique form ("PRTF") on April 15, 2009. She rated plaintiff on 12.04, Affective Disorders, and 12.06, Anxiety-Related Disorders (R. 871-873), with mild limitation in the area of restriction of activities of daily living; moderate limitation in the areas of maintaining social functioning and maintaining concentration, persistence, or pace; with no episodes of decompensation. (R. 878). She tied her findings to evidence found in the record. (R. 880). Dr. Varghese also completed a mental RFC in conjunction with the PRTF. (R. 882-885). Plaintiff was given a marked limitation in the ability to understand, remember, and carry out detailed instructions, and in the ability to interact appropriately with the general public. The 17 remaining categories were

all rated "not significantly limited." (R. 882-883). Dr. Varghese stated plaintiff could perform simple tasks with normal supervision, could "related superficially for work purposes," "relate to the public in an incidental manner," and "adapt to a work situation." (R. 884).

On November 23, 2009, Dr. Trinidad performed a third evaluation of plaintiff for his workers' compensation claim. (R. 886-890). Upon physical examination, Dr. Trinidad found "mild crepitation" in plaintiff's right knee, tenderness and spasm in plaintiff's lumbar spine from L3-S1 bilaterally, positive straight leg testing, reduced range of motion in his lumbar spine, and deep tendon reflexes were symmetric with normal sensation in his lower extremities. Dr. Trinidad also noted weakness in plaintiff's left leg "in a L4 and L5 distribution," with the remainder of the examination unremarkable. (R. 888). Dr. Trinidad reviewed all of plaintiff's medical records, and in his discussion and summary, opined the combination of plaintiff's prior disability awards with his new assessment resulted in plaintiff being "100 percent permanently and totally disabled on a physical and economic basis as he is unable to earn any wages in any employment for which he is, or could become, physically suited or reasonably fitted by education, training or experience." (R. 889).

Further records from Bill Willis Community Health and Substance Abuse Rehab Center submitted March 15, 2010, covering most of 2009 into 2010, and made part of the record by the Appeals Council, show plaintiff was still battling his depression, that he moved to Tennessee to live with an old friend, was compliant with his medication, and resumed treatment in mostly stable condition for his depression upon moving back to the area. (R. 891-915).

## Procedural History

Plaintiff alleges his disabling impairments include "hurt[ing] his back on the job," and pain radiating into his left leg. (R. 150, 161). In assessing plaintiff's qualifications for disability, the ALJ determined plaintiff was insured for Title II benefits through September 30, 2012. At step one of the five step sequential evaluation process, the ALJ found he had not engaged in substantial gainful activity since his alleged onset date of July 14, 2008. The ALJ found severe impairments of degenerative disc disease, status post fusion at L4-5 and L5-S1, status post fusion at L2-3 and L3-4, status post hardware removal (times two), obesity, depression, and post-traumatic stress disorder at step two. At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or equaled a listing, focusing on Listing 1.04 (disorders of the spine), and 12.04 (affective disorders). (R. 17). The ALJ applied the "special technique" at this step in evaluating plaintiff's mental impairments and found no episodes of decompensation, mild restriction in activities of daily living, and moderate limitation with social functioning and concentration, persistence, and pace.

Before moving to step four, the ALJ found plaintiff had the residual functional capacity ("RFC") to:

> … perform light work as defined in 20 CFR 404.1567(b) except he can perform only simple tasks with incidental contact with the public.

(R. 18). At step four, the ALJ determined plaintiff could not return to his past relevant work. Relying on testimony from a vocational expert at step five, the ALJ determined plaintiff would be able to perform the alternate work of mailroom clerk, laundry sorter, clerical mailer, and bonder. (R. 21-22). The ALJ concluded that plaintiff was not disabled under the Act from July 14, 2008, through the date of the decision. (R. 22).

Plaintiff's allegations of error are as follows:

1. The ALJ failed to properly consider the medical source evidence and the opinion of his vocational expert;

2. The ALJ failed to properly consider Claimant's obesity; and

3. The ALJ failed to perform a proper credibility determination.

(Dkt. # 19 at 2).

## Discussion

**Medical source evidence**

Plaintiff alleges that the ALJ "totally ignored" the opinion Dr. Trinidad offered that plaintiff was "100 percent disabled," and that he "totally ignored" a third FCE. While the Court finds this wording to be inaccurate, this issue is case dispositive.

First, the ALJ did not ignore Dr. Trinidad's opinion. He did, however, misquote the opinion as a finding of "temporarily totally disabled." As noted *supra*, Dr. Trinidad's actual opinion states plaintiff was "100 percent permanently and totally disabled on a physical and economic basis as he is unable to earn any wages in any employment for which he is, or could become, physically suited or reasonably fitted by education, training, or experience."

The Court is not permitted to interpret medical records for the ALJ. See Clifton v. Chater, 79 F.3d 1007, 1008 (10th Cir. 1996) (holding that the court will not "engage in the task of weighing evidence in cases before the Social Security Administration."). In addition, the Court "may not create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself." Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004). See also Grogan v. Barnhart, 399 F.3d 1257, 1263 (10th Cir. 2005). The ALJ's mischaracterization of Dr. Trinidad's opinion leaves the Court with no

means of properly evaluating the ALJ's decision without engaging in some post-hoc rationalization and without interpreting Dr. Trinidad's medical records.

Second, the ALJ noted that statements of disability such as the ones opined by Dr. Trinidad were made in the context of a Workers' Compensation claim and were specific to a particular employer, not the much broader job market base Social Security must consider. (R. 20). Although the ALJ's statement is correct in that the Commissioner is not bound by decisions of other agencies, the ALJ he still must consider such evidence and explain why it is not persuasive. See Bacav. Dep't. of Health and Human Servs., 5 F.3d 476, 480 (10th Cir. 1993). He did not do so here.

Thus, a remand is necessary to allow the ALJ to clarify his understanding and interpretation of Dr. Trinidad's opinion at Exhibit 35F, and to explain what weight, if any, he gave to it.

Plaintiff also contends the ALJ "totally ignored" a functional capacity evaluation performed by Kabrick & Associates, a physical therapy office.[7] The record shows the ALJ reviewed this evaluation; however, he simply noted that the evaluation "indicated [plaintiff] could perform sedentary work," and failed to explain further. (R. 19). On remand, the ALJ should explain the weight, if any, given to this functional capacity evaluation.

Plaintiff also alleges that the ALJ failed to properly consider plaintiff's obesity by finding it a severe impairment at step two, then not considering it again in subsequent steps. The undersigned agrees.

---

[7] Plaintiff concedes the ALJ "did mention two other, earlier FCEs done by other entities. (Dkt. # 19 at 2). However, the second functional capacity evaluation mentioned by the ALJ is Exhibit 30F, the evaluation plaintiff claims was "totally ignored."

Although the ALJ noted at step three that "[plaintiff's] obesity has been evaluated under the criteria set forth in SSR 02-1p; *Policy Interpretation Ruling Titles II and VXI: Evaluation of Obesity* (Sept. 12, 2002)" he failed to discernibly include this severe impairment in subsequent steps. "If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered *throughout* the disability process." 20 C.F.R. § 404.1523 (emphasis added). Failure to consider all plaintiff's limitations is reversible error. See Givens v. Astrue, 251 Fed.Appx. 561, 566 (10th Cir. 2007) (citing Salazar v. Barnhart, 468 F.3d 615, 621 (10th Cir. 2006)). Upon remand, the ALJ is instructed to consider and discuss how plaintiff's severe impairment of obesity impacts his RFC, to include additional VE testimony if necessary.

## Conclusion

The decision of the Commissioner finding plaintiff not disabled is hereby REVERSED and REMANDED as set forth herein.

SO ORDERED this 13th day of August, 2012.

_____
T. Lane Wilson
United States Magistrate Judge